724 So.2d 458 (1998)
Volley BIVENS, Jr., Appellant,
v.
Kenneth and Paulette MOBLEY, Appellees.
No. 97-CA-00225COA.
Court of Appeals of Mississippi.
December 8, 1998.
*459 Gregory D. Keenum, Booneville, for Appellant.
Nicholas B. Phillips, Iuka, for Appellee.
Before THOMAS, P.J., DIAZ and SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. This is an appeal in an easement dispute decided by the Tishomingo County Chancery Court. The dominant estate owner argues that he should be granted more extensive rights under the easement and that additional compensation besides $1,500 in attorney's fees should be awarded. The servient estate owners argue, though without a cross-appeal, that the easement was abandoned and that attorneys' fees were improper. We reverse as to the finding that the easement did not include the right to lay a waterline, but affirm in all other respects.

FACTS
¶ 2. Kenneth Mobley owned a tract of land north of a tract owned by Volley Bivens in Tishomingo County. In 1978, Mobley and Bivens exchanged these properties; the Mobley tract later was owned both by Kenneth and Paulette Mobley. The deed from Bivens to Mobley reserved an easement, fifteen feet wide, along the east side of what *460 became Mobley's property, using this language:
There is also conveyed an easement to run with the above described land for ingress and egress to and from the Patrick Road [on the south] to the above described land....
¶ 3. Despite the retained east side easement burdening Mobley's land for Bivens's benefit, Bivens actually accessed his property through the west side of Mobley's tract on a driveway beneath an electric company's overhead power lines. That power line was constructed near the time of the exchange of property. Apparently no grant of easement rights has ever been made for the power line driveway. After the new access began to be used, Mobley constructed a house a few feet from the essentially unused east side easement and incorporated part of the easement into his yard. Bivens testified that he told Mobley not to build the house actually on the easement, but he did give Mobley shrubs for the easement. Bivens himself fertilized the shrubs for eighteen years in an effort to make the shrubs grow enough to create a visual barrier. Content to use the west side driveway, neither neighbor complained of what was occurring with the east side easement for fifteen years. During that time relations between the two parties were good.
¶ 4. The latent threat to the neighborliness was the fact that the parties shared a common waterline which ran along the west driveway. The only water meter was in Mobley's name, and Bivens would pay his share of the bill to Mobley. Mobley was informed in 1993 by the water association that only one dwelling was allowed per water meter. Bivens testified that he was told by Paulette Mobley that he needed to get his own water meter on the line. Bivens preferred to run a water line through the unused east side easement, but the Mobleys did not wish this to happen. The chancellor found that Bivens could have continued to get water without the use of the contested, east side easement. The water service to Bivens's property was disconnected in September of 1993, and a tenant he had in a trailer on the property unsurprisingly left at that time.
¶ 5. After Bivens stated that he was going to install a line through the east side easement, Mobley got a temporary restraining order in December of 1993. The Mobleys filed a complaint on February 24, 1994. They sought to have the easement declared the result of a mistaken description, as the west side access was the easement intended. Alternatively, the Mobleys sought to have the easement declared abandoned or lost through adverse possession. A cross-complaint was then filed by Bivens to enjoin the Mobleys from interfering with use of the east side easement. After an evidentiary hearing, the chancellor found that the east side easement across the Mobley property had not been abandoned. It was an meaningless victory for Bivens, though, since the chancellor found that the easement was solely for access and could not also be burdened by a water line. Attorneys' fees of $1500 were awarded to Bivens, though other expenses were denied. After each party filed motions for extensions of time in which to file a notice of appeal, only Bivens actually filed a notice.

DISCUSSION
¶ 6. The appellees Kenneth and Paulette Mobley defend the refusal of the chancellor to grant a right to construct a water line. However, they seek reversal of the chancellor's finding that the easement still existed and had not been abandoned. They would also have us determine that the chancellor erred in awarding the attorneys' fees. To make such arguments regarding a trial court's errors, an appellee must file a crossappeal. To file a cross-appeal, notice must be given within fourteen days from an appellant's filing an appeal. M.R.A.P. 4(c). Though the trial court granted the Mobleys a thirty-day extension to file a notice of appeal, they never filed one, perhaps relying on the fact that Bivens filed an appeal.
¶ 7. Failure to file a notice of crossappeal is usually considered fatal to a crossappellant's issues. Lindsey v. Lindsey, 612 So.2d 376, 378 (Miss.1992). However, the supreme court at least once held that the failure to file a cross-appeal invokes the discretion of the appellate court. Morrow v. Morrow, 591 So.2d 829, 832 (Miss.1991) ("[I]t *461 is within this Court's discretion to either address or ignore the issue"). Were we to use that discretion and give full consideration to the "cross-appeal," we would not find error in the ruling regarding abandonment, but we would as to fees. We examine both sides' issues in logical order.

1. Easement had been abandoned (crossappeal).
¶ 8. The Mobleys argue that the east side easement was abandoned. The chancellor addressed the issue of adverse possession in his opinion, but did not explicitly discuss abandonment. The Mobleys were found not to have carried their burden of showing by clear and convincing evidence that they had possessed the servient estate in a manner adverse to the dominant estate's continued enjoyment of an easement. The complaint filed by the Mobleys under notice pleading rules just states that "at no time has [Bivens] ever utilized the easement for any purpose." Instead, the Mobleys "possessed and used exclusively that portion of their property described as the easement for a continuous and uninterrupted period of fifteen (15) years in an open, notorious, and hostile manner." The complaint definitely alleged adverse possession with its words of legal art such as "open, notorious, and hostile," and inferentially also raised abandonment.
¶ 9. No detailed findings on adverse possession were made, and no findings on abandonment appear at all. As with any such absence, we will assume that the court made the fact findings necessary to support its judgment. Pace v. Owens, 511 So.2d 489, 492 (Miss.1987).
¶ 10. The facts relied upon by the chancellor regarding possession were that Bivens himself provided the shrubs that were planted on part of the easement, and that he walked along the easement to get to the road that lay south of the Mobley property. Also in the record was that Bivens fertilized the shrubs every year. What was not shown by clear evidence was equally important. For adverse possession several elements of possession must be proven: hostile, open, continuous for ten years, exclusive, and peaceful under a claim of ownership. Thornhill v. Caroline Hunt Trust Estate, 594 So.2d 1150, 1152-53 (Miss.1992). We are pointed to no direct evidence that the Mobleys claimed ownership, that they ever affirmatively indicated their possession was hostile to Bivens's easement, or that it was exclusive. The chancellor could have inferred these elements from the evidence, but also was entitled not to do so. Since Bivens testified that he continued at least in minor ways to use the easement (though in ways for which an easement might not even have been necessary), and the Mobleys took no explicit steps to indicate that they considered the easement at an end, there was no manifest error in the chancellor's rejection of adverse possession.
¶ 11. Once the easement is properly created (the Mobleys do not renew their attack on the easement's being a mutual mistake), abandonment requires "protracted non-use for an extended period of time," which creates a "presumption of abandonment." R & S Development, Inc. v. Wilson, 534 So.2d 1008, 1010 (Miss.1988). That presumption becomes stronger if there is an intent to abandon that is also shown. Id. One of the cases that the Mobleys cite emphasizes that intent to abandon an easement is the principal consideration. Columbus & Greenville Ry. Co. v. Dunn, 184 Miss. 706, 719-20, 185 So. 583 (1939).
¶ 12. There was no direct testimony that Bivens desired to abandon the easement. Once the chancellor found that the east side easement was not the result of a mistaken description, then the initial intent to have this easement was confirmed. Bivens might have been unwise to abandon the sole legal right he had to gain access to his property in favor of what at best was an easement by prescription beneath the power line; such considerations do factor into a conclusion about intent. Bivens testified that when the Mobleys were building their house a few years after the easement was created, he reminded them not to build on the easement. That would have been after the time that the power line had been constructed, and Bivens had that alternative access. Bivens did not say that he never intended to abandon the easement, but he did say that during this *462 more than a decade of using another road to his property "I haven't forgot about my easement, I'll assure you."
¶ 13. Abandonment is a question of fact, based primarily on intent and on such circumstantial evidence that reflects on intent. We find adequate evidence to support the conclusion that this easement was still in effect.

2. The easement should include the right to construct a water line
¶ 14. Bivens agrees with the chancellor's decision that an east side easement existed, but argues that the easement "includes a right to necessities which will not unreasonably burden the land owner," in this case running a water line. He encourages us to follow the Alabama Supreme Court and allow the easement's use for activities which do not "materially affect" it. Carter v. Stringfellow, 293 Ala. 525, 306 So.2d 273, 276 (Ala.1975). That court permitted a sewer line to be laid along an easement that had solely granted access to a lake; the line was to be laid with as little interference with the servient estate's use as was reasonably possible. Id. With respect for our sister state's view and without necessarily disagreeing with the result in that suit, we find the concept of "material effect" to be the wrong focus. A court should not get into the business of determining, as in a zoning decision, what is going to have an adverse impact. It is what the parties agreed that is our focus. If what they agreed nonetheless has a significant impact, or if they agreed that certain uses that have no material effect are still not allowed, that is what controls.
¶ 15. An easement is a burden on a servient estate, the Mobley's in this case, that benefits the dominant estate here owned by Bivens. Such contracted-for intrusion into the normal bundle of property rights owned by the Mobleys should be read consistently with the purpose of the easement. As with interpreting other grants and reservations of rights in real property, we start with the requirement to consider the instrument as a whole and determine the intent from the document's language if it is possible to do so. Peoples Bank and Trust Co. v. Nettleton Fox Hunting & Fishing Ass'n, 672 So.2d 1235, 1237 (Miss.1996). It is argued that a necessary part of the grant or reservation of an easement of ingress and egress is the right to lay utility lines of various sorts.
¶ 16. Scant authority has been discovered for this issue. One appeal dealt with a private right-ofway granted by a board of supervisors. Rowell v. Turnage, 618 So.2d 81 (Miss.1993). Rowell had purchased landlocked property and decided that he wanted to develop a residential subdivision. He could not negotiate an adequate right-of-way. He invoked the procedures of a statute that authorizes a county board to grant a "private road laid out through the land of another, when necessary for ingress and egress...." Miss.Code Ann. § 65-7-201 (Rev.1991). The appellate issues were whether the right-ofway Rowell acquired would prevent the owner of the servient estate from placing gates across the property, and whether the rightof-way could be used to lay a water-line. Rowell, 618 So.2d at 82.
¶ 17. Determining the rights gained under a statutory easement starts with the meaning of the statute itself. The statute is unadorned, i.e., it does not refer to anything but a "private road" and does not grant the board the right to grant a right of way with, for example, such reasonable conditions as the circumstances require. Miss. Code Ann. § 65-7-201. Had the board nonetheless written into the easement document some terms that were broader than the statutory language, then the validity of such terms would be an issue under statutory interpretation principles. The intent of the parties to the easement would not matter any more than would the intent of a landowner whose property was condemned as to how much property he wished to convey. What was evident was that when a right-of-way is taken involuntarily, the easement is narrowly construed. Id. at 85.
¶ 18. Though the facts of Rowell are readily distinguishable, there is some general language in the case that is applicable. What is important for an arms-length, negotiated easement is the intent of the parties. Id. at 86. Facts regarding intent are to be *463 determined from the circumstances surrounding the transaction. The relevant circumstance to the Rowell court was that the property was being used at the time of the creation of the easement as a cattle ranch, which made the right to erect gates indispensable. Even as to the involuntary easement in Rowell, the court found that the contemplation of the parties should be considered. Id. at 87.
¶ 19. The court then stated that it was proper to deny the use of the right of way for laying water or sewer lines. Id. Since the court had already discussed for several pages of its opinion that the extent of the rights granted under an easement depended on intent, an intent that was discernible from the documents and the circumstances, the court must have been finding that the evidence supported the chancellor's conclusion. Id. at 85-87. One of the authorities cited was a Mississippi case in which the owner of a pipeline easement successfully blocked the servient estate owner from flooding the right of way for a lake. Sumrall v. United Gas Pipe Line Co., 232 Miss. 141, 97 So.2d 914 (1957). The Sumrall court held that the owner of an easement has "the right to exercise all the incidents necessary for the full enjoyment of that easement," which means as to a pipeline easement the right for "ready accessibility to the line for maintenance and repair." Id. at 147, 97 So.2d at 916. However, each owner also was required to use the property in such a manner as to minimize the interference with the other estate owner's use. Id. at 148, 97 So.2d at 916.
¶ 20. The other authority cited was a New York decision that did not find in the grant of an easement for ingress and egress any implied right to erect power lines. McCormick v. Trageser, 24 N.Y.2d 873, 249 N.E.2d 467, 301 N.Y.S.2d 622 (N.Y.1969). There was no written opinion in the New York case, but merely a reversal of the lower court decision that had dismissed the complaint to block the power line. Id., reversing McCormick v. Trageser, 28 A.D.2d 1086, 285 N.Y.S.2d 684 (1967). We cannot discern whether facts, law, or a combination caused the reversal.
¶ 21. Thus the supreme court was not citing precedents that declared a per se rule (the opinion-less New York case creates no rule at all). We find in Rowell the simple requirement that the intent of the parties, based on the surrounding circumstances, must be examined to determine the rights granted under this easement. The relevant intent here is what did Mobley and Bivens mean when the 1978 language created an "easement to run with the above described land for ingress and egress" from the public road to Bivens's property? This intent was not a question in the trial. The parties dealt with whether the easement should have been described on the west instead of the east side of the one-acre tract, whether Bivens had been damaged by interference with his rights, and whether the easement had been abandoned or lost through adverse possession.
¶ 22. The chancellor made no findings about the intent of the parties, either from their statements or from the surrounding circumstances. Bivens testified that the reason for the 1978 land swap was that the power association's right-of-way had already been laid across his land without his permission. Instead of fighting this intrusion, he agreed to exchange property. Mobley testified that the power line was cleared probably a day or two after the land swap, which would mean it was not the cause of the swap. Perhaps one witness was talking about the clearing of the land and the other was addressing the erecting of the power lines. Regardless, both parties agreed that the land swap and the unauthorized west side clearing were extremely close in time and that the east side easement never had to be used for access. There was also testimony that at the time of the land swap, what access there was to the northerly tract was on the east side, which was the location of the easement described in the deed.
¶ 23. Such evidence shines little light on intent. On the one hand, the issue of the need for power lines had discordantly been brought to everyone's attention near the time that the deed was executed. This might imply that the parties intended that any right of way to the isolated tract would permit utility lines to be laid. Yet on the other hand, what raised the issue was the clearing *464 of land on the west side for a power line. If that circumstance predated the land swap, it would highlight the need for a clearly defined west side easement and not the one on the east that was granted. There was evidence, though, that some of the land on the west crossed by the power line was not owned by either individual. On the east may have been the only place in which Bivens and Mobley could by themselves provide for access.
¶ 24. We review the case that the parties were content to try and the evidence that they were content to present. In fact, addressing intent as a separate issue would have perhaps done no more than create a temptation for each side's witnesses to inject imaginative recollections useful to the question. Our conclusion is that the circumstances of the 1978 transaction express nothing about intent. We are then left with determining what is implied in the easement as a matter of law.
¶ 25. An informed analysis, controlling only to the extent of its persuasiveness, can be found in the Restatement. The text quite properly first states that the language of the document controls.
[T]he parties are free to determine the extent of the use rights conferred on the beneficiary of a servitude. If their intent is ascertained, it should be given effect. In the absence of detailed arrangements between them, it is assumed that the owner of the servitude and the holder of the servient estate are intended to exercise their respective rights and privileges in a spirit of mutual accommodation.
RESTATEMENT OF THE LAW (THIRD) OF PROPERTY (Servitudes) § 4.10 cmt. a (Tentative Draft No. 4, 1994). There is no express language in this deed, other than "ingress and egress." In the absence of evidence of intent, we must give a more precise meaning to the general concept of access.
¶ 26. The Restatement then summarizes a "general rule that the beneficiary of an easement is authorized to make any use of the servient estate that is reasonably necessary for the convenient enjoyment of the servitude for its intended purpose." Id. § 4.10 cmt. c. Such use should not be so intrusive as to "cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment...." Id. This formulation is similar to the Mississippi Supreme Court's statement that the owner of an easement has "the right to exercise all the incidents necessary for the full enjoyment of that easement...." Sumrall, 232 Miss. at 147, 97 So.2d at 916.
¶ 27. An easement for ingress and egress is a straightforward concept that encompasses surface use and whatever improvements and maintenance to the roadway that are necessary to permit continued travel. Access to a lake suggests the right to bring across the easement anything normally used at a lake. Access to a homesite would imply the right to bring such vehicles, equipment, and materials necessary to construct or repair the home or other structures. The Mobleys in effect argue, and of course the chancellor so held, that access to a homesite does not permit the home owner to be connected to the outside world by what today would be considered necessities: a water line, sewer line, fiberoptic cable, or any other subsurface system. Are such underground structures, in the words of the Sumrall court, "incidents necessary for the full enjoyment of that easement," or must a separate right be purchased for their construction?
¶ 28. We return to the Restatement for an answer. On this point the authors first conclude that the "uses that are reasonably necessary for enjoyment of an easement change over time as technology changes and as use of the dominant and servient estates changes." RESTATEMENT OF PROPERTY § 4.10 cmt. c. At the beginning of this century, the necessary use of an easement that was the sole means of ingress and egress to even the most elaborate structure probably was nothing more than as a surface roadway. Today, even many primitive structures are connected physically in some way back along the trail to the outside world. The RESTATEMENT gives a specific illustration of this:
O, the owner of Blackacre, granted an easement to Able, the owner of Whiteacre, for "ingress and egress" from Whiteacre to the public street abutting Blackacre. The deed did not specify whether utility lines could be placed in the easement. Unless *465 the facts or circumstances suggest that the parties intended otherwise, it would be proper to define the purpose of the easement generally to include access for anything that could conveniently be transported through the easement corridor and that would normally be used in connection with property situated like Whiteacre, including utility services.
Id. § 4.10 illus. 4.
¶ 29. We hold that when evidence of intent is non-existent, a negotiated easementnot a statutory one as in Rowell for ingress and egress to a tract on which a home is to be built means more than a surface roadway on which people and vehicles travel. Ingress and egress for other necessities, whether carried in vehicles or continuously conveyed underground, is included in the grant. Limitations may arise if the use inconveniences the servient estate in a significant way.
¶ 30. We reverse the chancellor's finding that there is no right to lay a waterline.

3. Award of attorneys' fees and refusal to award damages.
¶ 31. Bivens argues that the award of $1,500 in attorneys' fees was inadequate and that the court's refusal to compensate him for other expenses incurred in this lawsuit was likewise in error.
Mississippi follows the American rule regarding attorney fees: unless a statute or contract provides for imposition of attorney fees, they are not recoverable.... When there is no contractual provision or statutory authority providing for attorney fees, they may not be awarded as damages unless punitive damages are also proper....
Century 21 Deep South Prop. v. Corson, 612 So.2d 359, 375 (Miss.1992) (citations omitted). There is no contract or statute permitting attorneys' fees in this case, nor would punitive damages have been proper. The failure of the appellee to cross appeal on this issue causes us to exercise our discretion and leave the attorneys' fees award undisturbed.
¶ 32. The other compensation that Bivens sought but was not awarded included costs for a surveyor, lost rental income because of the loss of access to water, and cost of insurance on property that he could not lease but still had to maintain. The trial court rejected the damage claim for a lack of proof of causation. He found that Bivens at all times could have installed a water meter on the line entering his property on the west side, but "he elected not to install a meter and therefore by his own volition he was denied water to his trailer."
¶ 33. One hurdle for Bivens is whether all or any of these damages would have even been recoverable had they been the result of the Mobleys' blocking the use of the east side easement. City of Laurel v. Bush, 238 Miss. 718, 730, 120 So.2d 149, 155 (1960) (finding the cost of surveyor needed for litigation not recoverable). We need not separately consider each item of damage as we accept that adequate evidence existed to support the chancellor's fact finding that the easement dispute is not what caused these damages. Bivens had a duty to mitigate his damages and failed to do so. See Georgia Pacific Corp. v. Armstrong, 451 So.2d 201, 206 (Miss.1984).
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF TISHOMINGO COUNTY IS REVERSED AND RENDERED AS TO THE RIGHT TO USE THE EASEMENT FOR A WATER LINE, AND AFFIRMED IN ALL OTHER RESPECTS. COSTS OF APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEES.
McMILLIN, P.J., and DIAZ, HERRING, HINKEBEIN, KING and PAYNE, JJ., concur.
THOMAS, P.J., concurs in part and dissents in part with separate written opinion, joined by BRIDGES, C.J., and COLEMAN, J.
THOMAS, P.J., concurring in part, dissenting in part:
¶ 35. I concur with Judge Southwick's treatment of issues 1 and 3 but respectfully disagree with his conclusion in issue 2 that Bivens's easement necessarily included the *466 right to install or lay a waterline. Our scope of review when a chancellor has made a finding of fact is extremely limited. We will not disturb the finding of a chancellor unless clearly shown to be erroneous and manifestly wrong. Myers v. Blair, 611 So.2d 969, 971 (Miss.1992) (citations omitted). The chancellor in his findings of fact and conclusions specifically found:
The Court finds that the easement granted to Mr. Bivens is merely an easement of ingress and egress. Thus, Mr. Bivens has the right to enter, go upon and return from the lands in question. It is merely a pathway by which Mr. Bivens can go to and from his property located on the north side of the easement. It does not confer upon Mr. Bivens the right to install a water meter or water line.

(emphasis added).
¶ 36. The chancellor received the evidence and heard the testimony of the witnesses. He could just as readily have ruled in favor of Bivens. He did not, and we are not, in my view of our limited scope of review, at liberty to disturb his ruling.
BRIDGES, C.J., and COLEMAN, J., join this separate written opinion.